STATE OF NORTH CAROLINA
v.
THOMAS HOWARD GROOMS, JR., Defendant

No. COA12-1183

Filed 1 October 2013

1. **Evidence—prior crimes or bad acts—driving while impaired—malice—no prejudicial error**

    The trial court did not commit prejudicial error in a driving while impaired case by admitting evidence of defendant's drinking habits and of prior incidents in which defendant drank alcohol while driving. Challenged testimony regarding an incident two months earlier was properly admitted as evidence of malice and the trial court did not abuse its discretion in admitting the evidence under Rule 403.

**STATE v. GROOMS**

[230 N.C. App. 56 (2013)]

Further, any error in admitting the remaining challenged testimony was not prejudicial, given the State's evidence.

**2.   Homicide—second-degree murder—malice—sufficient evidence**

    The trial court did not err in a driving while impaired case by denying defendant's motion to dismiss a second-degree murder charge where there was sufficient evidence of each element of the offense, including malice.

Appeal by defendant from judgments entered 28 March 2012 by Judge Paul L. Jones in New Hanover County Superior Court. Heard in the Court of Appeals 26 March 2013.

*Attorney General Roy Cooper, by Assistant Attorney General Kathryne E. Hathcock, for the State.*

*Duncan B. McCormick for defendant-appellant.*

GEER, Judge.

Defendant Thomas Howard Grooms, Jr. appeals from his conviction of two counts of second degree murder and possession of an open container of an alcoholic beverage in the passenger area of a motor vehicle. On appeal, defendant primarily contends that the trial court erred under Rule 404(b) of the Rules of Evidence in admitting evidence of defendant's drinking habits and of prior incidents in which defendant drank alcohol while driving. We hold that the trial court properly admitted as evidence of malice testimony regarding an incident two months earlier on the same road in which defendant's impaired driving badly frightened his female passenger who forced him to pull over his car and who expressed substantial concern about his driving while impaired. With respect to the remaining challenged testimony, we hold that any error was not prejudicial. Given the State's evidence, there is no reasonable possibility that the jury would have reached a different verdict in the absence of the challenged evidence.

## Facts

    The evidence viewed in the light most favorable to the State tended to show the following facts. On 2 April 2011, defendant met Joan Grady for a date at a restaurant in Holden Beach, North Carolina. When Ms. Grady arrived at the restaurant at approximately 6:00 or 7:00 p.m., defendant was sitting at the bar with a scotch and soda. Defendant finished

his drink and had another at the bar. The two ate dinner, during which defendant had a glass of wine, and they left the restaurant around 8:30 or 9:00 p.m.

Subsequently, defendant drove to Wilmington, North Carolina for a date with another woman, Pat Martin. Ms. Martin asked defendant if she could borrow $100.00 to repay a loan to a friend. Defendant agreed and drove Ms. Martin to the friend's house, stopping on the way to purchase food from an Arby's restaurant at 11:12 p.m. Ms. Martin entered her friend's house, but a few minutes later returned to defendant's car. Defendant then drove Ms. Martin to a pub in Wilmington where they stayed until 2:00 a.m. Defendant had another scotch and soda at the pub.

After the pub closed, defendant drove to Ms. Martin's apartment where he drank a 12 ounce glass of Bacardi 151 rum. Ms. Martin pulled out a clear plastic bag containing a white powdery substance and offered it to defendant. Defendant snorted some of the powder through a straw, knowing that it was an impairing substance. Ms. Martin explained to defendant that she had actually used his $100.00 to buy the powder and asked defendant to drive her back to buy more. Defendant agreed, stopped by the ATM to get cash, gave Ms. Martin another $100.00 to buy more powder, and drove to the house they had visited earlier. Defendant snorted more powder in his car after Ms. Martin made the second purchase.

Defendant then drove back to Ms. Martin's apartment where he drank a second 12 ounce glass of Bacardi 151 rum. Defendant left in the morning to drive home and, at approximately 9:15 or 9:20 a.m., was driving south on River Road. At that point, defendant had been awake for 24 hours straight.

The weather conditions were clear and sunny, and there was very light traffic on River Road. River Road has a four foot wide bicycle lane on the right side of the roadway in each direction of travel. There is also at least a 15 foot wide grass and dirt shoulder on each side of the road except for three locations where there are small bridges. Many bicyclists train on River Road, and from the beginning of River Road at its northernmost point heading south, there are 22 signs on the right side of the road warning of the bike lane.

Defendant passed three bicyclists riding in a line within the bicycle lane on River Road and drove unusually close – within an arm-and-a-half's length – to one of the bicyclists, alarming the bicyclist. Shortly after passing the bicyclists, defendant "swerved" off the paved roadway

STATE v. GROOMS

[230 N.C. App. 56 (2013)]

to the right -- defendant's right tires were completely in the grass shoulder of the road and his left tires were completely in the bicycle lane. Defendant continued driving off the roadway for five to six seconds and then reentered his proper lane of travel. After returning to the paved road, defendant's car weaved back over into the bicycle lane.

While still travelling south on River Road, defendant twice more swerved off the roadway onto the grass shoulder, each time travelling with his right tires completely off the road and his left tires in the bicycle lane for two to three seconds, with it then taking defendant another three to four seconds to reenter his proper lane. These three incidents all happened within one and a quarter miles of each other.

Robert Miller was driving his Jeep directly in front of defendant's silver Buick. At approximately 9:29 a.m., on a completely straight section of River Road, Mr. Miller moved over into the opposite lane of travel, which was clear, to give a wide berth to two bicyclists -- Ronald David Doolittle II ("David") and his 17-year-old son, Ronald David Doolittle III ("Trey") -- who were riding south in the bicycle lane. At that same time, defendant picked up his cell phone and made a call to Ms. Grady.

Seconds later, as Mr. Miller looked into his rearview mirror to reenter the southbound lane, he saw defendant's car, traveling at approximately 55 miles per hour, run into David. David's head struck and shattered defendant's windshield. Immediately thereafter, defendant hit Trey, sending him flying into the air. At the time of the collisions, 90% of defendant's car was outside of the proper lane of travel, and the car was partially on the grass shoulder.

Defendant did not brake before, during, or immediately after the collisions. Defendant simply continued driving south on River Road until Mr. Miller, who had stopped some 50 to 100 yards down the roadway, flagged down defendant and directed him to stop and return to the scene of the accident. Defendant then made a U-turn and parked on the northbound shoulder of River Road roughly 15 feet from the victims. Defendant got out of his car and walked over to the victims, but did not attempt to render aid or even call 911. Rather, defendant returned to his car where he calmly sat, appearing, according to Mr. Miller, as if he had "[n]ot a care in the world."

David died immediately following the collision. Trey was still taking shallow breaths and was rushed to New Hanover Regional Medical Center where doctors attempted to save his life. Because of the severity of his injuries, they were unable to do so.

At the accident scene, defendant remained in his car until approached by Trooper Brian Phillips with the North Carolina Highway Patrol. Defendant's responses to the trooper's questions were "very slow and delayed," and defendant appeared "very relaxed, dazed, and kind of carefree." Defendant had red, glassy, droopy eyes, and there was a mild odor of alcohol on his breath. When defendant exited his car to walk to the trooper's patrol car, defendant staggered three times and almost fell over.

When Trooper Phillips asked about the odor of alcohol on his breath, defendant claimed he had not been drinking that day, had drunk three alcoholic beverages with dinner the night before, and had been working all night. In the patrol car, defendant was unable to keep his head still, as instructed, during the horizontal gaze nystagmus ("HGN") field sobriety test.

Defendant's blood was drawn on the scene at 11:14 a.m. Later chemical analysis of defendant's blood revealed that at 11:14 a.m., defendant's blood had an alcohol concentration of .13 grams of alcohol per 100 milliliters of whole blood. Calculations using retrograde extrapolation showed that, at the time of the collision, defendant's blood alcohol concentration was .16 grams of alcohol per 100 milliliters of whole blood.

Officers searched defendant's car and found, on the front driver's side floorboard, a straw with a white powdery substance at one end. Officers additionally found one nearly empty bottle of Southern Comfort liquor and one three-fourths-full bottle of Bacardi 151 liquor in the back seat, two bottles of Mountain Dew in the passenger area, and an empty bottle of Bella Sera wine in the trunk.

Trooper Phillips took defendant to the Highway Patrol office in Wilmington. Lieutenant Todd Radabaugh of the North Carolina Wildlife Resources Commission, a drug recognition expert, began an evaluation of defendant at the Highway Patrol office at 12:00 p.m. Lieutenant Radabaugh administered sobriety tests on defendant including the Romberg balance test, the walk-and-turn test, the one-leg-stand test, the finger-to-nose test, and the HGN test. Defendant exhibited clues of impairment on every test. Based on his observations, Lieutenant Radabaugh determined defendant had consumed a sufficient amount of alcohol to appreciably impair his physical and mental faculties.

In addition, defendant exhibited clues of impairment by a central nervous system stimulant, including having body tremors, a dry mouth, an extremely fast internal clock (when asked to perform exercises for

STATE v. GROOMS

[230 N.C. App. 56 (2013)]

a certain amount of time), dilated pupils in various lighting conditions, and high blood pressure. When defendant was placed in a dark room with a black light, officers observed a white powdery substance on his mustache just beneath his right nostril, on his left cheek, and on his shirt. Accordingly, Lieutenant Radabaugh further determined that defendant "ingested alcohol and a central nervous system stimulant to the extent that his mental and physical faculties were appreciably impaired."

The State presented evidence that when a central nervous system depressant such as alcohol is mixed with a central nervous system stimulant, the effects of the two drugs can be compounded rather than neutralized such that the user is more impaired than the user would be on either drug alone. At the Highway Patrol office, defendant denied taking any stimulants in the 48 hours prior to the collision. Defendant stated that the previous day, at 2:00 p.m., he had taken a Percocet for pain even though he did not have a prescription for Percocet. Percocet would, however, have the opposite effect on the central nervous system from that of a stimulant. Defendant also stated that he took Zoloft for anxiety the night before the collision.

Trooper Phillips then took defendant to the New Hanover County detention center where a swabbing was obtained of defendant's right nostril. Subsequent laboratory testing of the swab from defendant's right nostril, as well as laboratory testing on the straw located on defendant's floorboard, revealed the presence of mephedrone, a psychoactive stimulant and a chemical analogue of the controlled substance cathinone. Cathinone was a Schedule I controlled substance for years prior to 3 April 2011; mephedrone became a controlled substance on 1 June 2011, roughly two months after the collision at issue in this case. However, as a chemical analogue of a controlled substance prior to 1 June 2011, mephedrone – marketed as a "bath salt" – was legal *only* if not intended for human consumption.

On 25 April 2011, defendant was indicted for the second degree murders of David and Trey. In a separate indictment, defendant was indicted for felony death by motor vehicle of David, driving while impaired, reckless driving, possession of an open container of an alcoholic beverage in the passenger area of a motor vehicle, and possession of drug paraphernalia.

At trial, defendant testified in his own defense. He acknowledged drinking two alcoholic beverages while with Ms. Grady, a third drink with Ms. Martin at a pub, and two 12 ounce glasses of Bacardi 151 rum at Ms. Martin's apartment. In addition, he admitted snorting the white

substance Ms. Martin purchased, knowing it was an impairing substance. Defendant claimed that, upon leaving Ms. Martin's apartment to drive from Wilmington to Carolina Beach, he felt "extremely tired," but did not feel too impaired to drive. He admitted that, in retrospect, he was "obviously" appreciably impaired and that he was "legally intoxicated with alcohol" at the time of the collision.

Although defendant also admitted his driving caused the victims' deaths, he denied running off the road three times prior to the collision. Rather, defendant claimed he ran off the road only once prior to the collision and that it was due to his tiredness. Defendant believed that the witnesses who testified to him driving off the road multiple times prior to the accident had "over-exaggerated" – he claimed that the witnesses were "ganging-up" on him.

The jury found defendant guilty of two counts of second degree murder, felony death by vehicle,[1] driving while impaired, reckless driving, possession of an open container of an alcoholic beverage in the passenger area of a motor vehicle, and possession of drug paraphernalia. The State then dismissed the charges of driving while impaired and possession of drug paraphernalia, and the trial court arrested judgment on the guilty verdicts for felony death by vehicle and reckless driving.

The trial court sentenced defendant to a presumptive-range term of 144 to 182 months imprisonment for one count of second degree murder and a consecutive, presumptive-range term of 144 to 182 months imprisonment for the second count of second degree murder and for possession of an open container of an alcoholic beverage in the passenger area of a motor vehicle. Defendant timely appealed to this Court.

I

**[1]** Defendant first argues that the trial court erred in admitting the testimony of Thelma Shumaker, a woman defendant dated for a period of time, regarding a specific incident in which defendant drove while impaired on River Road two months before the collision, as well as her testimony that defendant habitually drank alcohol, drank alcohol while driving 20 times, and drove while impaired one or two additional times. Defendant contends this evidence was not admissible under Rule 404(b)

---

1. The verdict sheet incorrectly states the victim in the felony death by vehicle charge was "Ronald David Doolittle III" when the indictment alleged, with respect to that offense, the death of "Ronald David Doolittle II." However, defendant does not raise this issue on appeal and the trial court arrested judgment on that conviction, rendering any error harmless.

of the Rules of Evidence. "We review de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b)." *State v. Beckelheimer*, 366 N.C. 127, 130, 726 S.E.2d 156, 159 (2012).

With respect to the specific incident, Ms. Shumaker testified that on 6 February 2011, Super Bowl Sunday, she went on a date with defendant. Prior to picking up Ms. Shumaker in Carolina Beach and driving her to Wilmington for the date, defendant had been drinking alcohol. On the drive from Carolina Beach to Wilmington, defendant drank one cup of Mountain Dew mixed with vodka. The two attended a play in Wilmington that began at 1:00 p.m., but left at the intermission and drank Mountain Dew mixed with vodka in defendant's car. Defendant then drove Ms. Shumaker to a restaurant in Wilmington, where they ate and had two glasses of wine apiece.

After dinner, Ms. Shumaker and defendant walked to a bar where they each drank two or three vodka martinis. They next walked to a different bar, where they each drank a glass of red wine. Defendant's speech was slow and slightly slurred and his movements were slow. Ms. Shumaker believed "a hundred percent" that defendant was impaired and should not have been driving. Defendant then drove Ms. Shumaker back to Carolina Beach on River Road.

As they traveled down River Road, Ms. Shumaker began to feel "panicky." Defendant weaved within his lane and, at times, weaved slightly into the wrong lane of travel. Ms. Shumaker testified that there were several times where "if a car was coming we might have been in trouble." Ms. Shumaker believed defendant was driving too fast. At one point, defendant nearly hit a mailbox on the right side of the road. Ms. Shumaker finally told defendant: " '[S]top the car, I'm having a panic attack, I need to breathe.' "

Defendant pulled over, and Ms. Shumaker got out and walked to the back of the car. Defendant also got out, apologized to Ms. Shumaker, and told her he did not want her to be scared. Ms. Shumaker told him "[b]asically that we've had a lot to drink, and you really should drive much slower than you were." Ms. Shumaker was upset, angry, and fearful, and "[d]efinitely" expressed those feelings to defendant. With respect to riding in the car with defendant that night, she told him that she "had made a mistake, and [she] wanted to live." Defendant told her he would drive slower, and the two then traveled without incident the remainder of the way to Ms. Shumaker's residence.

We hold that this testimony was relevant to malice, an element of the second degree murder charges. *See State v. Locklear*, 159 N.C. App. 588,

591, 583 S.E.2d 726, 729 (2003) (" 'Second-degree murder is defined as the unlawful killing of a human being with malice but without premeditation and deliberation.' " (quoting *State v. Rick*, 342 N.C. 91, 98, 463 S.E.2d 182, 186 (1995))), *aff'd per curiam*, 359 N.C. 63, 602 S.E.2d 359 (2004). In *Locklear*, as in this case, the defendant, who was driving while impaired, was charged with second degree murder following a fatal collision. This Court explained that malice in such cases may be proven by a showing that the "defendant had the intent to perform the act of driving in such a reckless manner as reflects knowledge that injury or death would likely result, thus evidencing depravity of mind." *Id.* at 592, 583 S.E.2d at 729. This Court concluded that a prior DWI conviction is evidence that tends to show malice because it shows that the defendant was "on notice as to the serious consequences of driving while impaired." *Id.*

For the same reason, our appellate courts have also upheld the admission of evidence of a defendant's pending charge for DWI to show malice when the circumstances surrounding the pending charge were sufficiently similar to those surrounding the charged offense. *State v. Jones*, 353 N.C. 159, 173, 538 S.E.2d 917, 928 (2000) ("While we recognize that such evidence may not be used to show a defendant's propensity to commit a crime, we agree with the State's contention that the circumstances attendant to the pending DWI charge -- defendant was speeding on the wrong side of the road and ran another motorist off the road while impaired -- demonstrate that defendant was aware that his conduct leading up to the collision at issue here was reckless and inherently dangerous to human life. Thus, such evidence tended to show malice on the part of defendant and was properly admitted under Rule 404(b)." (internal citation omitted)).

In this case, Ms. Shumaker's description of defendant's impaired driving only two months before the fatal collision was similar to the events that gave rise to the second degree murder charges. In both instances, after drinking a substantial amount of alcohol, defendant traveled down River Road, weaving and leaving his lane of travel. On 6 February 2011, defendant crossed the center line into the opposing lane and weaved over to the right, almost hitting a mailbox. Prior to the fatal collision, defendant repeatedly weaved off the right side of the road, leaving his lane of travel and crossing over the bike lane, so his right tires were on the shoulder. He also just missed hitting another bicyclist.

The evidence of this prior incident of impaired driving was relevant to malice because Ms. Shumaker's reaction to his driving -- forcing him to stop -- and her remarks to him about the amount he had had to drink, his driving, and her fear put defendant on notice, only two months

earlier, of the dangers of driving while impaired on River Road. Indeed, Ms. Shumaker specifically said to defendant that she had made a mistake in riding with him because she wanted to live.

While defendant points to some factual distinctions between the two incidents, we believe that the events are sufficiently similar to allow a jury to find that Ms. Shumaker's fear about his driving and her comments to him showed that he acted with malice when, two months later, he again drove down River Road while significantly impaired. *See Locklear,* 159 N.C. App. at 594-95, 583 S.E.2d at 731 (finding substantial similarity between prior DWI arrest and events leading to second degree murder charge when both incidents involved the defendant driving with blood alcohol level over legal limit and defendant causing collision by making "unsafe" turn). We, therefore, hold that the trial court properly admitted this testimony under Rule 404(b) of the Rules of Evidence.

Defendant further argues that, even if evidence of the 6 February 2011 incident was relevant to show malice, the trial court abused its discretion in admitting the evidence under Rule 403 of the Rules of Evidence because the danger of unfair prejudice substantially outweighed the evidence's probative value. We review "the trial court's Rule 403 determination for abuse of discretion." *Beckelheimer,* 366 N.C. at 130, 726 S.E.2d at 159.

Prior to admitting Ms. Shumaker's testimony, the trial court heard voir dire testimony from Ms. Shumaker and an investigator, Jeffrey Hedge, who had taken a prior statement by Ms. Shumaker and who corroborated her voir dire testimony. In its written order concluding that the evidence was admissible, the court found that "[t]he probative value discussed above – i.e., the relevance of Ms. Schumaker's [sic] testimony to proving malice – is not substantially outweighed by danger of unfair prejudice, since there is little danger that a jury might seek to punish the defendant for those prior bad acts themselves, instead of using such prior bad acts to judge the defendant's state of mind at the time of the crime being prosecuted."

The order further provided:

    3.    The State has produced sufficient evidence to prove that the extrinsic act at issue was committed by the defendant in that the State has shown that:

        a.    Ms. Schumaker [sic] was apparently well-situated to know the dangerousness of defendant's driving

            on prior instances when defendant drove after consuming alcohol;

b.    There are indicia of reliability contained in Ms. Schumaker's [sic] statements, in part because she knows things that would not be known by casual observation, rumor, or reputation; and

c.    There were multiple photographs of Ms. Schumaker [sic] possessed by defendant, which indicated a relationship that gave Ms. Schumaker [sic] a unique opportunity to see, hear, and know the facts about which she would be called to testify[.]

After the Rule 404(b) evidence was admitted during the direct examination of Ms. Shumaker, the trial court gave a limiting instruction to the jury. The court gave another appropriate Rule 404(b) limiting instruction in its final charge to the jury.

Given the probative value of the evidence of the 6 February 2011 incident to show malice, the careful process employed by the trial court in deciding the issue, the court's weighing of any unfair prejudice, the fact that no accident occurred during the prior incident (thus lessening the chance that the jury would seek to punish defendant for his behavior during the prior incident), and the limiting instructions, the trial court did not abuse its discretion in admitting the evidence under Rule 403. *See id.* at 133, 726 S.E.2d at 160–61 (finding no abuse of discretion given relevance of evidence to proper purpose and given trial court's careful handling of issue, including hearing testimony of Rule 404(b) witness outside presence of jury, hearing arguments of counsel, considering Rule 403, and giving a limiting instruction).

With respect to the additional testimony by Ms. Shumaker that defendant "always" had alcohol in his possession while driving, that she was with him when he drank while driving 20 times, that he drove while impaired an additional one or two times, that he kept liquor and mixers in his car, and that he typically mixed and consumed drinks both before and while driving, defendant contends that this evidence "improperly indicated that [defendant] had a propensity to drive while drinking and that he therefore must have been drinking while driving on the morning of the accident." Even assuming, without deciding, that this evidence was inadmissible, we hold that defendant cannot show a reasonable possibility that the jury would have reached a different verdict in the absence of that evidence. *See* N.C. Gen. Stat. § 15A-1443(a) (2011).

STATE v. GROOMS

[230 N.C. App. 56 (2013)]

At trial, the issue was not whether defendant had been drinking while driving on the morning of the accident. There was no dispute that defendant had been drinking substantial amounts of alcohol and ingesting a controlled substance that was a stimulant, further impairing him, throughout the hours leading up to the collision. It was undisputed that defendant had, since the prior evening, consumed at least three scotches and soda, a glass of wine, and 24 ounces of rum and had twice snorted mephedrone (also known as bath salts, a stimulant that increases the level of impairment from alcohol). In addition, defendant had open, partially-consumed bottles of rum and Southern Comfort in his car. He had a blood alcohol level of .16 at the time of the accident, staggered three times when walking to the Highway Patrol Trooper's car, and nearly fell over.

Witnesses saw defendant repeatedly weaving into the bike lane and off onto the shoulder, with him almost hitting another bicyclist. Defendant then was picking up his cell phone and making a call when he struck the two victims with his car while entirely out of his lane of travel. He never braked and had to be flagged down by another motorist. At the scene, defendant did not call 911 or attempt to provide aid. He just sat in his car. When questioned by officers, he lied.

Moreover, less than two months earlier, he had so scared his girlfriend while driving impaired on the same road in a similar manner that she told him that she had made a bad decision to drive with him because she wanted to live. Ms. Shumaker, who had two DWI convictions herself prior to the time she dated defendant, testified that she had talked to defendant about the dangers of drinking and driving:

> Q. And you had, in fact, pled guilty to driving while impaired offenses. You knew the dangers of that, didn't you?
>
> A. (Nods head affirmatively.)
>
> Q. Did you ever talk to [defendant] about the dangers of drinking and driving?
>
> A. Yes.
>
> Q. What did he tell you about that?
>
> A. "Maybe I should look for help."[2]

---

2. While defendant mentions this testimony in his Rule 404(b) argument, it does not appear that he is challenging it on appeal. We note, in any event, that this evidence of a conversation between Ms. Shumaker and defendant either does not amount to testimony about a prior bad act by defendant or is evidence relevant to malice since it shows again that he was aware of the dangers of drinking and driving prior to the date of the collision.

Finally, defendant admitted at trial that he was driving while "legally intoxicated" and that he was "obviously" appreciably impaired on the morning of the charged offenses, even though he claimed he did not feel impaired at the time. Although defendant claimed the witnesses at trial were ganging up on him, he also admitted that he ran off the road once prior to hitting the victims, that he had been awake for 24 hours prior to attempting to drive home, and that he felt "extremely tired and sleepy" while driving.

Given this evidence, we cannot conclude that there was any reasonable possibility that the jury would have reached a different verdict if Ms. Shumaker's testimony about defendant's habitual drinking while driving had been excluded. In sum, we conclude that evidence of defendant's impaired driving on 6 February 2011 was admissible to show malice under Rule 404(b), and the court did not abuse its discretion under Rule 403 in admitting that evidence. The admission of the remaining evidence, even if erroneous, amounted to harmless error.

II

[2] Defendant next argues that the trial court erred in denying his motion to dismiss the second degree murder charges for insufficient evidence of malice. "This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007).

" 'Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied.' " *State v. Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (2000) (quoting *State v. Barnes*, 334 N.C. 67, 75, 430 S.E.2d 914, 918 (1993)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). "In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose*, 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994).

Here, the evidence showing malice included (1) Ms. Shumaker warning defendant of the dangers of drinking and driving; (2) a prior incident of drinking and driving on the same road that led Ms. Shumaker to panic and fear for her life; (3) defendant's blood alcohol level of .16,

twice the legal limit; (4) defendant's consumption of an illegal controlled substance that he knew was impairing; (5) defendant's swerving off the road three times prior to the collision, giving defendant notice that his driving was dangerous; (6) despite the swerving, defendant's failure to watch the road because he was making a phone call immediately before the collision; (7) defendant's failure to brake before or after the collision; and (8) defendant's failure to call 911 and attempt to provide aid to the victims.

Our courts have found comparable evidence of malice sufficient to defeat a motion to dismiss. *See, e.g., State v. Davis*, 197 N.C. App. 738, 743, 678 S.E.2d 385, 389 (2009) (holding evidence of malice sufficient for trial court to properly deny motion to dismiss in second degree murder case stemming from crash caused by impaired driving where evidence showed defendant had a ".13 BAC"; "ran over a sign and continued driving" and, at that point, should have known that he was a danger to the safety of others; continued driving and weaving side to side; eventually ran off road; and, without braking or otherwise attempting to avoid collision, hit another truck), *aff'd in part, rev'd in part on other grounds*, 364 N.C. 297, 698 S.E.2d 65 (2010); *State v. McDonald*, 151 N.C. App. 236, 243, 565 S.E.2d 273, 277 (2002) (holding State presented substantial evidence of malice in second degree murder case resulting from impaired driving based, in part, on evidence that defendant "was driving without looking at the road in order to pick up a lit cigarette he had dropped" when defendant's truck "literally flew across the intersection"); *State v. McAllister*, 138 N.C. App. 252, 260, 530 S.E.2d 859, 864-65 (2000) (holding trial court properly denied motion to dismiss for insufficient evidence of malice in second degree murder case resulting from impaired driving based, in part, on evidence that "defendant drove his pickup truck erratically, swerved off the road, and struck the victim's bicycle while he was traveling at a speed of approximately 35 to 40 miles per hour"). *See also State v. Norman*, 213 N.C. App. 114, 127, 711 S.E.2d 849, 859 (holding State presented substantial evidence of malice for second degree murder charge resulting from impaired driving collision when defendant had four prior DWI convictions, defendant's blood alcohol level was .08, defendant admitted speeding, defendant was impaired on alcohol and cocaine, and State presented expert testimony as to correlation between effects of cocaine and high-risk driving), *disc. review denied*, 365 N.C. 360, 718 S.E.2d 401 (2011).

In arguing that the evidence of malice was insufficient, defendant points to the fact that he had no prior DWI or other driving-related convictions, he was not speeding, and he did not cross the center line of

River Road at any time. While these factors are relevant to malice, the State, in this case, presented other evidence equally sufficient to prove malice. Ms. Shumaker's testimony showed the same kind of notice that prior driving convictions supply. There is no material difference between swerving across the center line into the oncoming traffic lane and swerving across a solid line into the bike lane where bicyclists are riding. And, an absence of speeding is immaterial when the driver is repeatedly weaving over the bike lane and onto the shoulder, when the driver comes within an arm-and-a-half's length of a bicyclist, and when an impaired driver stops looking at the road in order to make a phone call.

Defendant also argues that Ms. Shumaker's warning to him about his driving on 6 February 2011 was related to speeding and not to his impairment, that mephedrone was not a controlled substance until 1 June 2011, that there are no scientific studies showing how it interacts with alcohol, and that the mephedrone – which defendant knew was an impairing substance – caused him not to feel impaired. These arguments all go to the weight and credibility of the evidence, issues for the jury that could not be resolved on a motion to dismiss. Because the State presented substantial evidence that defendant acted with malice, the trial court properly denied defendant's motion to dismiss.

No error.

Judges McGEE and DAVIS concur.